**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| In re: | Chapter 11 |
| FAIRFAX BEST LIVING, LLC, | Case No. 26-11985 (SAH) |
| Debtor. | |

**SECURED CREDITOR SAPEREAN CAPITAL IV TB NOTE LENDER KD4, LLC'S**
**OBJECTIONS TO DEBTORS' AMENDED EMERGENCY MOTION**
**<u>FOR TURNOVER OF PROPERTY OF THE ESTATE</u>**

Kiran A. Phansalkar, OBA #11470
Preston M. Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
McAfee & Taft
8th Floor, Two Leadership Square
211 N Robinson Ave
Oklahoma City, OK  73102-7103
Telephone:  (405) 235-9621
Email:  kiran.phansalkar@mcafeetaft.com
         preston.sullivan@mcafeetaft.com
         beth.attaway@mcafeetaft.com

-and-

Nicholas A. Griebel
(*pending admission pro hac vice*)
POLSINELLI PC
7676 Forsyth Boulevard, Suite 800
St. Louis, Missouri 63105
Telephone:  (314) 622-6613
Email:  ngriebel@polsinelli.com
***Attorneys for Saperean Capital***
***IV TB Note Lender KD4, LLC***

67564192_1

**TABLE OF CONTENTS**

The Loan Transaction ....................................................................................................2

The Debtors' Default ....................................................................................................4

Appointment of Receiver ..............................................................................................6

    A.    The Receiver is a "Custodian" Under the Bankruptcy Code    8

    B.    Basis for Relief Under Section 543(d)(2) of the Bankruptcy Code    9

    C.    Basis for Relief Under Section 543(d)(1) of the Bankruptcy Code    9

        i.    Debtors Lack Any Ability to Reorganize .................................................12

        ii.    Debtors are Unable to Use the Property for the Benefit of its Creditors..................................................................................................16

        iii.    Debtors Will Once Again Mismanage the Property if Turned Over .........17

## TABLE OF AUTHORITIES

**Cases**

*French Bourekas Inc. v. Turner*,
  199 B.R. 807 (E.D.N.Y. 1996) ........................................................................................ 16

*In re Bryant Manor, LLC*,
  422 B.R. 278 (Bankr. D. Kan. 2010) .............................................................................. 10

*In re CCN Realty Corp.*,
  19 B.R. 526 (Bankr. S.D.N.Y. 1982) .............................................................................. 17

*In re Constable Plaza Assocs., L.P.*,
  125 B.R. 98 (Bankr. S.D.N.Y. 1991) .............................................................................. 11

*In re Dill*,
  163 B.R. 221 (Bankr. E.D.N.Y. 1994) ............................................................................ 10

*In re Franklin*,
  476 B.R. 545 (Bankr. N.D. Ill. 2012) ............................................................................... 9

*In re LCL Income Properties, L.P. VI*,
  177 B.R. 872 (Bankr. S.D. Ohio 1995) ........................................................................... 11

*In re Lizeric Realty Corp.*,
  188 B.R. 499 (Bankr. S.D.N.Y. 1995) ............................................................................ 11

*In re Orchards Village Invs., LLC*,
  405 B.R. 341 (Bankr. D. Or. 2009) ................................................................................. 10

*In re Packard Square LLC*,
  575 B.R. 768 (Bankr. E.D. Mich. 2017) ......................................................................... 10

*In re Sabana Del Palmar, Inc.*,
  No. 12-06177, 2013 Bankr. LEXIS 2258 (Bankr. D. P.R. May 29, 2013) ...................... 11

*In re Uno Broadcasting Corp.*,
  167 B.R. 189 (Bankr. D. Ariz. 1994) .............................................................................. 11

*In re Wallace*,
  2011 Bankr. LEXIS 4382 (Bankr. D. Idaho Nov. 18, 2011) ........................................... 10

*Kulick v. YSA Investments 1, LLC*,
  C.A. No. 2025-1319-KSJM ............................................................................................. 15

*United States v. Myers*,
  106 F.3d 936 (10th Cir. 1997) .......................................................................................... 9

*Upperman v. Kulick*,
  No. 4:26-cv-00383-SH (N.D. Okla.) ............................................................................... 16

**Statutes**

11 U.S.C. § 543(d)(1) ............................................................................................................ 9

11 U.S.C. § 543(d)(2) ............................................................................................................ 9

**<u>Other Authorities</u>**

4 Collier on Bankruptcy, ¶ 543.05 at 543-12 (15th Ed. 1993)....................................................... 10

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

In re:

FAIRFAX BEST LIVING, LLC,

Debtor.

Chapter 11

Case No. 26-11985 (SAH)

**SECURED CREDITOR SAPEREAN CAPITAL IV TB NOTE LENDER KD4, LLC'S
OBJECTIONS TO DEBTORS' AMENDED EMERGENCY MOTION
<u>FOR TURNOVER OF PROPERTY OF THE ESTATE</u>**

Saperean Capital IV TB Note Lender KD4, LLC (the "**Lender**"), by its undersigned counsel, files this Objection (the "**Objection**") to Debtor's *Amended Emergency Motion for Turnover of Property of the Estate* (the "**Motion**"), which seeks an order directing Scott Sheffman with Friedman Real Estate Management LLC (the "**Receiver**") to immediately turn over and deliver the Property (defined below) to debtors Fairfax Best Living, LLC, Fairfax Investors, LLC, Woodland Oaks Best Living, LLC, and Woodland Oaks Investors, LLC (collectively "**Debtors**"),[1] which Property is currently under Receiver's possession, custody, and control.

Lender respectfully requests that the Court deny the Debtor's Motion. Pursuant to Section 543(d)(2) of the Bankruptcy Code, because the Receiver was appointed over the Property more than 120 days ago, this Court is required to excuse the Receiver's turnover obligations. In addition, pursuant to Section 543(d)(1) of the Bankruptcy Code, the interests of the creditors would be better served by permitting the Receiver to remain in possession, custody, or control of the Property. The

---

[1] On June 12, 2026, each of the Debtors filed separate bankruptcy petitions before this Court, as Case No. 26-11984, Case No. 26-11985, Case No. 26-11986, and Case No. 26-11987 (collectively, the "**Petitions**"), despite each being co-obligors under the same loan transaction and co-owners of the single asset real estate that is the subject of this matter. A motion for joint administration was filed in each pending bankruptcy action on June 25, 2026. A hearing on the motion for joint administration was set for July 8, 2026. An amended motion for joint administration was filed in each pending bankruptcy action on June 25, 2026.

1

Debtors' misconduct and mismanagement of the Property prior to the appointment of the Receiver illustrates the Debtors' utter inability to properly manage, maintain, and protect the Property and the tenants residing therein. In support of this Objection, Lender shows the Court the following:

## RELEVANT BACKGROUND[2]

### The Loan Transaction

1.      On or about June 1, 2022, the Debtors entered into that certain Loan Agreement, dated of June 1, 2022 (the "**Loan Agreement**"), by and between Debtors and Saperean Capital IV Originator, LLC ("**Original Lender**").  The Loan Agreement provided for a principal loan amount of $60,800,000.00, subject to the terms thereof (the "**Loan**").

2.      Contemporaneously therewith, the Debtors executed that certain Promissory Note Secured by Mortgage, dated as of June 1, 2022 (the "**Note**"), in favor of Original Lender, in the original principal amount of $60,800,000.00.

3.      In order to secure the amounts owed under the Note, in part, the Debtors executed that certain Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Filing, dated as of June 1, 2022 (the "**Mortgage**"), pursuant to which Debtors, as mortgagors, granted to Original Lender, as mortgagee, a first-priority lien on and security interest in certain real property, the improvements thereon, and personal property associated therewith, located as 7142 South 92nd East Avenue, Tulsa, Oklahoma 74133 (the "**Woodland Property**") and 7801 NE 10th Steet, Midwest City, Oklahoma (the "**Fairfax Property**" and together with the Woodland Property, as more fully described in the Mortgage, the "**Property**").

---

[2] Concurrently herewith, and in support of Lender's Motion to Dismiss, or in the Alternative, Excuse Turnover of Property (the "**Motion to Excuse Turnover**"), Lender submitted the Affidavit of Shawyan Ahmadian (the "**Lender Affidavit**").  Lender hereby relies upon, and incorporates by reference, the Lender Affidavit, to support the statements made herein with respect to the Loan.

4.    The Mortgage was recorded (i) with the County Clerk of Oklahoma County (the "**Oklahoma County Clerk**") on June 3, 2022, in Book 15175, Page 1255; and (ii) with the County Clerk of Tulsa County (the "**Tulsa County Clerk**") on June 3, 2022, as Document No. 2022158173.

5.    The Property consists of two separate multifamily apartment complexes – the Woodland Property located in Tulsa, Oklahoma and the Fairfax Property located in Midwest City, Oklahoma.

6.    The Loan Agreement, Note, Mortgage, Second Amendment (as defined below), and all other documents further evidencing, securing, or executed in connection with the Loan are sometimes herein referred to collectively as the "**Loan Documents**."

7.    Original Lender assigned all of its right, title, and interest in and to the Loan and Loan Documents to Lender, as evidenced in part by that certain Assignment of Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Filing and Other Underlying Loan Documents, recorded in the Tulsa County Clerk records on June 6, 2022, as Document Number 2022058958, and recorded in the Oklahoma County Clerk records on June 6, 2022, in Book 15177, Page 448.

8.    Accordingly, Lender is the current owner and holder of all of Original Lender's rights, title, and interest in and to the Loan and Loan Documents and is entitled to enforce the same.

9.    On or about June 16, 2025, Lender and Debtors entered into that certain Second Amendment to Loan Agreement, dated as of June 16, 2025 (the "**Second Amendment**"). Pursuant to Section 3 of the Second Amendment, Debtors agreed to deliver on or before September 15, 2025, certain items (collectively, the "**Required Deliverables**"), including, without limitation,

67564192_1                                                3

term sheets related to the sale of the Property and an "evergreen" irrevocable standby letter of credit in form and substance acceptable to Lender.

**The Debtors' Default**

10.     Debtors defaulted under the terms of the Loan Documents for, among other things, failing to deliver the Required Deliverables by September 15, 2025, which constitutes an Event of Default under the Loan Documents.

11.     Upon an Event of Default, Section 6.2(d) of the Mortgage gives Lender the right "[t]o apply to a court of competent jurisdiction for and obtain appointment of a receiver of the Property as a matter of strict right and without regard to the adequacy of the security for the repayment of the Secured Obligations."

12.     Section 6.2(e) of the Mortgage further gives Lender the right to possess, manage, and operate the Property as necessary. Further, under Section 3.2 of the Mortgage, upon the occurrence of an Event of Default, Lender has the right to collect all sums which may at any time become due or payable from the Property, including all rental income generated therefrom.  Thus, Debtors have no legal right to occupy the Property, nor do they have any further right to collect rents and other income generated therefrom.

13.     In addition, Section 10.2 of the Loan Agreement in pertinent part provides:

> Upon the occurrence of any Event of Default specified in this ARTICLE 10 . . . and at any time thereafter, Lender may, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand . . . that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including at its sole option declaring all sums owing to Lender under the Note, this Agreement and the other Loan Documents immediately due and payable.  . . .  During the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower

> or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Loan shall be declared due and payable.

14. Accordingly, on or about September 19, 2025, Lender provided notice to Debtors of Debtors' defaults under the Loan Documents (the "**Default Notice**"). Debtors failed to cure the Events of Default, and on or about October 9, 2025, Lender provided notice to Debtors of Lender's election to accelerate the debt owed with respect to the Loan, foreclose the Mortgage, and seek appointment of a receiver to take possession of and administer the Property (the "**Acceleration Notice**").

15. After accelerating the debt owed under the Loan, Lender became aware of additional Events of Default with respect to the Loan that included, without limitation, Debtors improperly granting a second-priority mortgage on the Property to YSA Investments I, LLC ("**YSA**") in connection with additional financing that Debtors' former manager, Marc Kulick, obtained in violation of the Loan Documents, as well as Debtors allowing numerous liens to be recorded against the Property as a result of Debtors' failure to pay vendors and other contractors for services provided to the Property.

16. Further, Lender was also informed by YSA, by letter dated January 29, 2026 (the "**YSA Letter**"), that in addition to the second-priority mortgage YSA holds on the Property, Debtors, by and through Mr. Kulick, granted YSA an equity pledge in the membership interests of Debtors, along with numerous other entities controlled by Mr. Kulick. YSA provided notice in the YSA Letter that in connection with its pledge, YSA "exercised its rights to protect and preserve the value of the Kulick-Owned Entities' membership interests" and "is now the sole member of each Kulick-Owned Entity and owns 100% of its membership interests." The Kulick-Owned Entities include each of the Debtors. A true and correct copy of the YSA Letter is attached hereto as **Exhibit A**.

67564192_1

5

**Appointment of Receiver**

17. On November 14, 2025, Lender filed its original *Verified Petition* (as later amended, the "**Complaint**") against Debtors in the District Court of Oklahoma County, Oklahoma (the "**State Court**"), Case No. CJ-2025-8499 (the "**State Court Case**"), seeking to enforce its rights and remedies under the Loan Documents, including foreclosure of the Property and appointment of a receiver for the Property. A true and correct copy of the Complaint (including the Loan Documents affixed as exhibits thereto) is attached hereto as **Exhibit B**.

18. On January 22, 2026, ***with the consent and agreement of the Debtors***, the State Court entered an *Agreed Order of Appointment of a Receiver* (which was later amended pursuant to that certain *Amended Agreed Order of Appointment of Receiver* entered on February 4, 2026 and referred to herein as the "**Receiver Order**"), pursuant to which the State Court appointed Scott Shefman with Friedman Real Estate Management ("**Receiver**") as receiver for the Property. A true and correct copy of the Receiver Order is attached hereto as **Exhibit C**.

19. Upon taking control of the Property, the Receiver discovered numerous issues with respect to the mismanagement of the Property and its severely deteriorated condition, including, without limitation, millions of dollars' worth of deferred maintenance. *See* Declaration of Scott Shefman (the "**Shefman Declaration**"), at ¶ 7, attached hereto as **Exhibit D**.

20. These conditions included the following: significant roof damage, non-functioning exterior lights, down units and boarded up windows, non-operational laundry facilities, deterioration of the laundry facilities, non-operational swimming pool and golf carts, significant pest and insect infestation, rodent issues, clogged sewer drains, and a leaking boiler resulting in loss of hot water for many residents. Shefman Decl., at ¶¶ 8-9. The Property also lacked an onsite management and leasing team and had no maintenance staff. Shefman Decl., at ¶ 10. Further, there were material delinquencies in gas, electric, and water/sewer bills requiring immediate payments

by the Receiver to avoid service interruptions. *Id*. A true and correct copy of the Receiver's Introduction/Takeover Update and the Monthly Receiver Report is attached hereto as **Exhibit E**.

**Foreclosure of the Property**

21.     Thereafter, Lender proceeded with non-judicial foreclosure with respect to the Property.  After canceling an earlier sale, Lender ultimately scheduled the Property to be sold at foreclosure sale scheduled for June 12, 2026 (the "**Sale**").  A true and correct copy of the Notice of Sale delivered to Debtors is attached hereto as **Exhibit F**.

22.     On June 12, 2026 (the "**Petition Date**"), just minutes before the Sale was scheduled to take place, counsel for the Debtors attended the Sale and informed counsel for Lender that each of the Debtors had filed the Petitions.  The Petitions were signed by Marc Kulick as "authorized signer."

23.     Exactly two minutes before the Sale, Borrowers' counsel was only able to provide Lender's counsel with the apparent bankruptcy notices for two of the Debtors, via Borrowers' counsel's cellphone.

24.     Lender conditionally conducted the Sale announcing that in the event that it was later determined that the automatic stay was in fact in place at the time of the Sale and the Bankruptcy Proceedings had been properly filed, the Sale would be deemed rescinded.  Otherwise, if the Bankruptcy Proceedings were not timely filed or were improperly filed, the results of the Sale would be upheld. Lender was the successful purchaser of both the Fairfax Property and the Woodland Property at the Sale.

## ARGUMENT

The Court should deny the Debtors' request for an order directing the Receiver to turn over the Property to Debtors because: (i) under Section 543(d)(2) of the Bankruptcy Code, the Court is required to excuse the Receiver's compliance with the turnover obligations of Sections 543(a) and

(b)(1) of the Bankruptcy Code, as the Receiver was appointed over the Property more than 120 days before the Petition Date, and (ii) under Section 543(d)(1) of the Bankruptcy Code, the interests of Debtors' creditors are overwhelmingly better served by permitting the Receiver to remain in possession, custody, and control of the Property, as the undisputed record demonstrates that the Debtors lack the financial and managerial ability to rehabilitate, stabilize, manage, operate, maintain, or successfully reorganize the Property if control were returned to them.

### A.  The Receiver is a "Custodian" Under the Bankruptcy Code

25.     Lender requests the Court deny the Motion and permit the Receiver to retain possession, custody, and control of the Property.  The general rule under Sections 543(a) and (b) of the Bankruptcy Code is that a "custodian" must turn over the property of a bankruptcy estate, unless otherwise excused, and must file a report of activities in the receivership under Fed. R. Bankr. P. 6002.

26.     Section 101(11) of the Bankruptcy Code defines "custodian" as a:

    (A)     receiver or trustee of the property of the debtor, appointed in a case or proceeding not under this title;

    (B)     assignee under a general assignment for the benefit of the debtor's creditors; or

    (C)     trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized under applicable law or a contract to take charge of the debtor's property to enforce a lien or for the general administration of such property for the benefit of creditors.

27.     Here, the Receiver was appointed by the State Court, in a case not under this title, for the purposes set out in the Receiver Order, and Receiver was appointed with Debtors' consent for the benefit of their creditors.  In addition, the Debtors concede that the Receiver is a "custodian" within the meaning of Section 101(11) of the Bankruptcy Code. [*See* Motion, ¶ 16].

28.     The Receiver was appointed over the Property *__130__* days prior to the Petition Date. As a result, turnover is not required pursuant to Sections 543(d)(1) and 543(d)(2) of the Bankruptcy Code.

**B.     Basis for Relief Under Section 543(d)(2) of the Bankruptcy Code**

29.     Pursuant to Section 543(d)(2) of the Bankruptcy Code, the Court "***shall excuse compliance***" with the turnover requirements of Sections 543(a) and (b)(1) of the Bankruptcy Code if "the custodian is an assignee for the benefit of the debtor's creditors that was appointed or took possession more than 120 days before the date of the filing of the petition".  11 U.S.C. § 543(d)(2); *see also United States v. Myers*, 106 F.3d 936, 941 (10th Cir. 1997) ("It is a basic canon of statutory construction that use of the word "shall" indicates a mandatory intent.").

30.     Here, the Receiver is an "assignee for the benefit of the debtor's creditors" because Debtors consented to such appointment for the benefit of its creditors.  In addition, the Receiver was appointed over the Property *__130 days__* prior to the Petition Date.  As such, the Receiver was appointed before the 120-day threshold in Section 543(d)(2) of the Bankruptcy Code.  The provisions of Section 543(d)(2) therefore require this Court to excuse the Receiver's turnover obligations.

**C.     Basis for Relief Under Section 543(d)(1) of the Bankruptcy Code**

31.     Pursuant to Section 543(d)(1) of the Bankruptcy Code, the Court may decline to order turnover pursuant to Sections 543(a), (b), and (c) of the Bankruptcy Code if "the interests of the creditors … would be better served by permitting the custodian to remain in possession, custody, or control[.]"  11 U.S.C. § 543(d)(1).

32.     Lender, as the party objecting to turnover, must show by a preponderance of the evidence that the best interests of the creditors are served by permitting a custodian to retain control of property of the estate. *In re Franklin*, 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012); *see also In re*

67564192_1                                                    9

*Packard Square LLC*, 575 B.R. 768, 778 (Bankr. E.D. Mich. 2017). Once Lender makes the required *prima facie* showing, the burden shifts to Debtors to show why turnover is appropriate. *Id.* "The interests of the debtor, however, are **not** part of the criteria considered when applying Section 543(d)(1)." *In re Dill*, 163 B.R. 221, 225 (Bankr. E.D.N.Y. 1994) (emphasis added) (citing 4 Collier on Bankruptcy, ¶ 543.05 at 543-12 (15th Ed. 1993) (stating "Section 543(d)(1) does not require an analysis of the interests of the debtor")).

33. While bankruptcy judges and practitioners alike should be sympathetic to the good-faith efforts of Chapter 11 debtors to rehabilitate and reorganize, a debtor's right to rehabilitate and reorganize is always subject to the terms and provisions of the Bankruptcy Code, and no public policy is served by efforts to abuse the bankruptcy process or utilize the bankruptcy process in a manner that is contrary to the specific provisions of the Bankruptcy Code. This is precisely why the Bankruptcy Code is not simply a haven of "debtor friendly" provisions and instead contains a series of sections that balance the rights and interests of debtors against those of creditors.

34. Courts use the following factors in deciding whether to excuse turnover pursuant to Section 543(d)(1) of the Bankruptcy Code: (i) whether there will be sufficient income to fund a successful reorganization; (ii) whether the debtor will use the property for the benefit of its creditors; and (iii) whether there has been mismanagement by the Debtors. *See* 5 Collier on Bankruptcy ¶ 543.05 (citing *In re Wallace*, 2011 Bankr. LEXIS 4382, at * 32-33 (Bankr. D. Idaho Nov. 18, 2011) (court declined to order turnover of rents to debtor who would not use them for the benefit of creditors); *In re Bryant Manor, LLC*, 422 B.R. 278, 291-92 (Bankr. D. Kan. 2010) (court determined that it was in best interests of creditors if receiver continued to operate apartment complex); *In re Orchards Village Invs., LLC*, 405 B.R. 341, 353-54. (Bankr. D. Or. 2009) (receiver not required to turn over assets and business operations where all three factors were

established, and where the receivership was precipitated by the debtor's failure to make payments on its loan); *In re LCL Income Properties, L.P. VI*, 177 B.R. 872, 875 (Bankr. S.D. Ohio 1995) ("Case law holds that mismanagement by debtor is to be considered in deciding a motion such as the present one."). *See also In re Sabana Del Palmar, Inc.*, No. 12-06177, 2013 Bankr. LEXIS 2258 at *11 (Bankr. D. P.R. May 29, 2013) (further considering as grounds for excusing turnover compliance: the debtor's lack of equity in the property, debtor's prebankruptcy consent to the receivership, and the receiver's performance); *see also In re Lizeric Realty Corp.*, 188 B.R. 499, 506 (Bankr. S.D.N.Y. 1995) (holding that a receiver was not required to deliver possession of property of the estate in circumstances very similar to this case because it did "not appear that the debtor will operate [the property] for the benefit of creditors," in that "[p]rior to the receiver's appointment, debtor defaulted under two mortgages, failed to pay taxes, and permitted liens to be filed against the Building"); *In re Uno Broadcasting Corp.*, 167 B.R. 189, 200 (Bankr. D. Ariz. 1994) (declining to require a receiver to deliver possession of property of the estate to the debtor, noting that the receiver had managed the property professionally and expeditiously, that the receiver was vastly experienced in managing properties in the industry, that the debtor's principal was not in physical proximity to the property, and that further management change would cause disruption of management and duplication of costs at the property).

35.    Finally, the Debtors' intent in filing to delay foreclosure is a proper consideration by the bankruptcy court on whether to order the turnover of property by a custodian. *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 104 (Bankr. S.D.N.Y. 1991). Specifically, Debtors' bankruptcy filings occurred (1) after a Motion for Temporary Restraining Order was filed and denied mere hours before the Sale, (2) just minutes before the scheduled Sale, (3) after Debtors consented to the appointment of a receiver and (4) after the Receiver had professionally and

67564192_1

11

competently administered the Property for more than four (4) months. Such timing further demonstrates that the Bankruptcy Proceedings were filed to frustrate and thwart Lender's enforcement efforts, rather than to facilitate a viable reorganization.

36.    All of the factors under Section 543(d)(1) weigh heavily in favor of declining to order the Receiver's to turnover the Property to Debtors and instead permitting the Receiver to remain in possession, custody, and control of the Property.

### i.    *Debtors Lack Any Ability to Reorganize*

37.    Debtors' ability to successfully confirm a Chapter 11 plan necessarily depends on Debtors' ability to stabilize its operations, fulfill its financial disclosure obligations, adequately protect Lender's interests, pay administrative expenses, collect rent, and manage the Property.

38.    Here, Debtors clearly are not capable of stabilizing their operations. As set forth above, Debtors' mismanagement of the Property necessitated the appointment of the Receiver in the first place, Debtors **_consented_** to the appointment of Receiver over the Property, and they have been divested of control and management of the Property for more than four (4) months. In fact, Lender recently elected to place the Property on Lender's master insurance policy as a result of Debtors' insurance expiring less than a month after the Receiver took over the Property.

39.    Moreover, Debtors are unable to generate sufficient income to simultaneously fund operations, remedy and maintain the condition of the Property, fund the administrative expenses of the bankruptcy estate, and provide adequate protection payments to Lender. *See* Motion, at ¶ 11 (observing "the Fairfax Property operates near breakeven at the property level"). Thus by Debtors' own admission, operating income from the Property is insufficient to fund operations, cover necessary capital expenditures, fund administrative expenses, and provide adequate protection payments.

67564192_1

40. Specifically, at the time the Receiver took control over the Fairfax Property, the Receiver noted that the Fairfax Property is in severe physical distress, and subject to at least thirty-nine (39) outstanding code violations. The Fairfax Property continues to suffer from extensive deferred maintenance, including widespread roof damage causing active water intrusion, non-functioning exterior lighting, boarded-up windows, inoperable laundry facilities, deteriorated parking areas with numerous potholes, damaged fencing and access gates, a non-operational swimming pool, a deteriorated fitness center, significant pest, insect, and rodent infestations, damaged carports, and substantial landscaping and curb appeal deficiencies. *See* Exhibit D. While the Receiver has engaged in mitigation of the significant issues at the Fairfax Property, deferred maintenance costs are in the millions of dollars and stabilization remains ongoing.

41. The Woodland Property was in similarly poor physical condition at the time the Receiver took control and likewise has suffered from extensive deferred maintenance and operational deficiencies, including roof damage affecting many of its buildings, with several roofs covered by temporary tarps following wind-related damage, nonfunctional exterior lighting, inoperable surveillance system, boarded up windows requiring replacement or repair, inoperable fitness center and pool, extensive wood rot in second-floor stair structures, damaged fencing, a leaking boiler severely impacting access to hot water, clogged sewer drains, significant rodent and bed bug infestations, and further damages necessitating substantial cleanup and aesthetic improvements. *See* Exhibit D. Again, while the Receiver continues to diligently and competently address the millions of dollars of deferred maintenance at the Property, the severity of the poor conditions has made these efforts challenging and time consuming.

42. Furthermore, contrary to Debtors' assertions, based upon the Receiver's review of the books and records maintained during the receivership, the Fairfax Property generated a

*negative* net operating income of ($256,650.40), before accounting for any debt service owed to Lender, the $95,760.69 of capital expenditures required, or the millions of dollars' worth of deferred maintenance that remains outstanding. With respect to the Woodland Property, the net operating income was $48,199.27, which amount similarly does not reflect any payment of debt service obligations, the $368,051.44 in capital expenditures required, or millions in deferred maintenance. Thus, the Property does not generate sufficient cash flow to service its indebtedness, much less fund the substantial capital expenditures necessary to stabilize operations, which stabilization is necessary in the first place due to Debtors' gross mismanagement of the Property. Further, as discussed above, the Property remains in significant disrepair, and is burdened by extensive deferred maintenance, municipal code violations, safety concerns, and significant capital repair needs. It is estimated that the cost of the repairs and improvements necessary to stabilize and preserve the Property will exceed $6 million. *See* Shefman Decl., at ¶¶ 12-13.

43.     Moreover, it is unlikely that Debtors will be able to confirm any plan of reorganization because the Petitions in this case were filed in bad faith, which constitutes grounds for dismissal and relief from the automatic stay, and Lender reserves all rights with respect thereto. At the end of the day, any turnover at this point will only further harm the Property, and the receivership assets should remain under the care and control of the Receiver.  The best interests of creditors are clearly served by keeping the assets, and the income therefrom, away from Debtors, and allowing Receiver to continue administering, stabilizing, rehabilitating, and improving the assets.

44.     Further, Debtors have failed to provide onsite management, leasing, or maintenance staff to the Property, requiring the Receiver to immediately recruit and hire property maintenance and leasing staff. Shefman Decl., at ¶ 10. Debtors also permitted material delinquencies in gas,

14

electric, and water/sewer utilities accounts, requiring the Receiver to make immediate payments to avoid servicing interruptions. Additionally, numerous vacant units at the Property have been filled with debris and abandoned personal property, requiring substantial cleanup before such units could be returned to service. Shefman Decl., at ⁋ 11.

45. Debtors' inability to reorganize is further demonstrated by the financial condition of Marc Kulick, the former managing member and controlling principal of Debtors. On June 9, 2026, the Delaware Court of Chancery issued a Post-Trial Memorandum Opinion in *Kulick v. YSA Investments 1, LLC*, C.A. No. 2025-1319-KSJM, finding that entities controlled by Kulick had defaulted on multiple loans and owed nearly one billion dollars to YSA. The Court further found that Kulick controlled a portfolio of approximately thirty-four multifamily properties (which includes the Property subject of this action) and repeatedly sought financing from a position of financial distress, admitting he was "desperate" for funding. The Court's findings are consistent with the circumstances present in the case at hand and further demonstrate that Debtors lack the financial wherewithal necessary to rehabilitate, stabilize, manage, operate, maintain, and successfully reorganize the Property. Further, according to the YSA Letter, it is unclear which entity is actually in control of Debtors. A true and correct copy of the Post-Trial Memorandum Opinion entered by the Court of Chancery of the State of Delaware on June 9, 2026 is attached hereto as **Exhibit G.**

46. Finally, on June 25, 2026, Upperman filed a Verified Complaint (the "**Upperman Complaint**") against Kulick in the United States District Court for the Northern District of Oklahoma, asserting claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) and Oklahoma law. The Upperman Complaint alleges Kulick, among other things, engaged in a years-long scheme to divert investor capital and rental revenues to fund his

extravagant lifestyle, while commingling and misappropriating entity funds, incurring unauthorized debt, granting unauthorized liens, obstructing access to books and records, and concealing the enterprise's deteriorating financial condition. *See* Upperman Complaint, at ¶¶ 1, 33–37, 45–54, 68–69, 91–92, 107, 119–121. The Upperman Complaint provides further evidence that this Court should decline to order turnover of the Property and instead maintain the status quo, allowing the Receiver to continue his efforts to administer, manage, operate, stabilize, rehabilitate, and improve the Property. A true and correct copy of the Upperman Complaint, as filed in the matter *Upperman v. Kulick*, No. 4:26-cv-00383-SH (N.D. Okla.), is attached hereto as **Exhibit H**.

47.    Given the substantial capital expenditures, ongoing maintenance, and operational demands required to stabilize the Property, the Debtors clearly lack the financial and managerial resources necessary to effectuate a successful reorganization. Rather, the Property requires significant immediate investments to address the deferred maintenance, code compliance issues, habitability concerns, and operational deficiencies. Under such circumstances, there is no reasonable likelihood that Debtors can establish a feasible plan of reorganization.

### ii.    *Debtors are Unable to Use the Property for the Benefit of its Creditors*

48.    Without any ability to reorganize, let alone improve the condition of the Property, it is obvious that Debtors are and will continue to be unable to use the Property for the benefit of the creditors.

49.    Further, a debtor's "major financial goal, as a single-asset real estate holding company, [is] to satisfy the secured claim of its creditor." *French Bourekas Inc. v. Turner*, 199 B.R. 807, 818 (E.D.N.Y. 1996). Because "the collection of rents could serve no meaningful purpose other than to be applied toward this obligation," Receiver should remain in place and be

permitted to continue collecting rents from the Property.  *In re CCN Realty Corp.*, 19 B.R. 526, 529 (Bankr. S.D.N.Y. 1982).

### iii.    Debtors Will Once Again Mismanage the Property if Turned Over

50.    Prior to the appointment of Receiver, Debtors severely mismanaged the Property, leading to the filing of the State Court Case and the Upperman Petition, as well as Debtors' eventual ***consent*** to the appointment of the Receiver over the Property.

51.    Debtors' mismanagement also resulted in the failure to generate revenues to cover operational costs (as evidenced by the numerous liens filed against the Property), much less repay the Loan.

52.    Return of the Property to Debtors will not only waste time and money already being expended by Receiver but would likely result in further degradation of the Property and risks to the health and safety of its residents.  It would be manifestly unjust for Debtors to capitalize off the significant efforts and performance of Receiver and his improvements to the Property, all at Lender's expense.

### CONCLUSION

53.    Lender, as the first-priority secured lender in this bankruptcy case, is at substantial risk if the Debtors are permitted to maintain possession, custody, and control of the Property. Debtors mismanaged Lender's collateral, and it is only through the efforts (and expenditures) of Lender and Receiver that any progress has been made at the Property.  Debtors only filed this bankruptcy case for the illegitimate and improper purpose of thwarting Lender's Sale.  Allowing Debtors to regain control of the Property would not only erase the significant progress over the last several months, but worse, would risk placing the Property's residents in harm's way, and it would condone and implicitly approve of Debtors' bad-faith and abuse of the bankruptcy process.

67564192_1

Accordingly, Lender respectfully submits that it is in Lender's and other creditors' best interests that Receiver remain in possession, custody, and control of the Property.

WHEREFORE, for the foregoing reasons, Lender respectfully requests that this Court enter an Order denying the Motion, excusing the Receiver from complying with Sections 543(a), (b), and (c) of the Bankruptcy Code, permitting Receiver to remain in possession, custody, and control of the Property, and granting such other and further relief that the Court deems just and proper.

Respectfully submitted,

*/s/ Kiran A. Phansalkar*
Kiran A. Phansalkar, OBA #11470
Preston M. Sullivan, OBA #33619
Elizabeth H. Attaway, OBA #35539
McAfee & Taft
8th Floor, Two Leadership Square
211 N Robinson Ave
Oklahoma City, OK  73102-7103
Telephone:  (405) 235-9621
Email:  kiran.phansalkar@mcafeetaft.com
            preston.sullivan@mcafeetaft.com
            beth.attaway@mcafeetaft.com

-and-

Nicholas A. Griebel
(*pending admission pro hac vice*)
POLSINELLI PC
7676 Forsyth Boulevard, Suite 800
St. Louis, Missouri 63105
Telephone:  (314) 622-6613
Email:  ngriebel@polsinelli.com
**Attorneys for Saperean Capital
IV TB Note Lender KD4, LLC**

67564192_1                                          18

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 2, 2026, I electronically transmitted this filing to the Clerk of the Court using the ECF system for filing and transmittal of Notice of Electronic Service to the ECF registrants of record.

*/s/ Kiran A. Phansalkar*

Kiran A. Phansalkar

67564192_1                                           19